MISSISSIPPI STATE HIGHWAY COMMISSION *v.* HILLCREST FARM, INC., et al.

No. 43338 February 8, 1965 171 So. 2d 491

*Tate Thigpen, G. B. Keaton,* Picayune, for appellant.

*Williams & Williams,* Poplarville, for appellee.

ETHRIDGE, J.

The Mississippi State Highway Commission, appellant, filed this eminent domain proceeding against Hillcrest Farm, Inc. (called Hillcrest) and others holding encumbrances, seeking a right-of-way for the limited-access interstate Highway No. 59, through the farm owned by Hillcrest. A Special Court of Eminent Domain awarded to Hillcrest damages of $40,000. The commission appealed to the Circuit Court of Pearl River County, where a jury verdict gave damages of $75,000. The commission contends that there was no evidence to support this verdict of the jury, and it is against the overwhelming weight of the evidence, and so excessive as to denote bias, passion and prejudice by the jury.

I.

Hillcrest Farm was developed originally several decades ago as a "show place." In May 1960 Dr. V. L. Stanfield and four associates purchased it in the name of Hillcrest Farm, Inc. from Alexander, for a consideration of $128,600. In October 1961 the United States Government announced that the National Aeronautics and Space Administration, Mississippi Test Facility, would acquire a buffer zone and begin work on that project. It is about eight miles from this property, bordering on the south boundary line of the corporate

limits of the City of Picayune. Although the testimony is indefinite as to the extent of the effect of this project upon the market price of this and other properties in Pearl River County, it reflects the project did cause some increase in the market price of land in this vicinity. See Mississippi State Highway Comm. v. Pepper, 250 Miss. 755, 168 So. 2d 307, 308 (Miss. 1964).

The farm consists of 1,328 acres of land in Pearl River County, about 4 miles east of the Village of Carriere, and about 10 road miles northeast of the City of Picayune, in the southern portion of the county. It does not front on a paved road, but a county gravel road crosses it several hundred feet north of its southern boundary, from east to west. The highway right-of-way takes a total of 47.34 acres of land. This includes 4.47 acres taken for relocation of a small segment of the county road, to permit the building of an overpass for the road over the interstate highway. The remaining acreage of 42.87 acres is taken for the limited-access highway. In the northeast portion this includes about 5 acres for a roadside park. The highway crosses this farm running from northeast to southwest.

After the taking of the right-of-way, 305 acres are left on the east side of the highway, and 975 acres remain on the west. The farm consists of improved pastureland, tung orchards, and second-growth timber. At the time of taking appellees used the property for raising cattle, and growing tung and timber. The right-of-way takes 35.35 acres in improved pasture, and 12 acres of second-growth but thick young timber. It also takes two tenant houses, one with 832 square feet, and the other with 616 square feet (plus porches). These tenant houses were in a bad state of repair. As a result of the taking, appellees will have to construct 15,443.9 feet of net wire and barbed wire fences along the highway and county road. Also the commission has condemned in effect 4,699.5 feet of appellees' frontage along

the gravel county road, which is several miles from Carriere and Picayune. There is no present residential demand for it.

Other than the two tenant houses taken, all buildings and other improvements are located on the west side of the highway, with the 975 acres. The entire property includes 14 miles of fencing and cross-fencing; 200 to 250 acres of tung trees and row crops; 350 acres of improved pasture, with bahia and white dutch clover; 700 to 728 acres of second-growth timberland, mostly pine timber of pole and saw log size, with some hardwood; and a pond or lake of 50 to 60 acres on the west side of the highway. Also on the west side of the highway, north of the county road, is a wood-framed dwelling house of 3,240 equare feet, apparently in a good state of repair, with four bedrooms, two baths, electricity and telephone. The corporate owners do not live in this residence, which apparently is used as a manager's home. Since the partly relocated county road will cross Highway 59 by an overpass, the road has to be built upon a fill ranging from 16 to 21 feet in height. This remaining house is 150 feet north of the road, and 225 feet west of the western boundary of the right-of-way of Highway 59. These facts no doubt result in damage to it.

Also in the tract west of the highway are two large concrete barns, well constructed, and in a reasonably good state of repair, although given comparatively little use in recent years. One of them has 9,000 square feet, asbestos shingles, and a concrete floor. Another large barn of 5,088 feet (sometimes divided into 4 smaller units) is similarly constructed. There are two concrete silos, a deep-water well, and a creek traverses the property under the highway.

On the east side of the highway are 305 acres of improved bahia grass pastureland, which will be cut off from the west side, so far as crossing over the farm

itself is concerned. This apparently is the largest pasture area on the farm. Access to the 305-acre tract on the east can be had by crossing the overpass of the county road. The highway right-of-way across the property varies in width from 300 to 663 feet at various points. On the north end, some distance from the residence, a 5-acre tract is being taken for use as a park and rest stop for motorists. Appellees say that this park will have an adverse effect upon their remaining property; that the starting and stopping of traffic, noise and diesel fumes will damage the residence.

For the drainage of water under the newly constructed roads, there will be four 18-inch pipes, one 24-inch pipe, one 30-inch pipe, one 8x6-foot box culvert, one 9x4-foot box culvert, and four 40-foot stand bridges 6 feet high. Appellees' evidence indicates that the flow of water through these conduits will cause washing and filling of mud and silt on their property opposite these drainage points.

All of the witnesses, for both petitioner and appellees, testified in general terms that they examined comparable properties, but on cross-examination, appellees' five witnesses on value gave no comparable sales of property in this vicinity aggregating anything like the prices they applied to this land.

Fifty acres in the southeast part, below the new highway and the county road, will be deprived of direct access to the water supply previously utilized in the southwest tract. In one sense, after the taking the farm will be divided into four parts, traversed by the county road and the new highway. Before the taking, it was divided into two tracts, separated by the county road.

The witnesses for petitioner and for defendants, with the damages estimated by them, may be summarized as follows:

| Name | Before Taking Value | After Taking Value | Damages | Percentage Reduction After Taking |
|------|-----|-----|-----|-----|
| For Petitioner | | | | |
| J. W. Morgan | $140,500.00 | $123,000.00 | $ 17,500.00 | 14.05 |
| C. B. Moore | 150,620.00 | 132,153.00 | 18,467.00 | 12.26 |
| F. L. Arbogast | 158,375.00 | 146,525.00 | 11,850.00 | 7.48 |
| Carle Cooper | 151,000.00 | 128,700.00 | 22,300.00 | 14.768 |
| For Defendants | | | | |
| V. L. Stanfield | 331,700.00 | 213,750.00 | 117,950.00 | 35.559 |
| O. A. Davis | 354,300.00 | 228,420.00 | 125,880.00 | 35.52 |
| C. C. Barefoot | 327,755.00 | 220,300.00 | 107,455.00 | 32.785 |
| Ferris E. Tate | 386,496.60 | 265,297.50 | 121,199.10 | 31.35 |
| E. F. Loe | 316,269.00 | 212,577.00 | 103,692.00 | 32.786 |

## II.

 █ After thorough consideration of the record, we conclude that the jury's verdict for damages of $75,000 is grossly excessive, and wholly unsupported by the evidence. Many factors support that conclusion, some of which we will summarize.

In May 1960 Hillcrest purchased this entire farm for $128,600. At the time of the taking on June 28, 1962, approximately two years later, its value before the taking, according to Tate, one of appellees' witnesses, had tripled to $386,496.60. According to their other four witnesses, the property was around two and a half times the price which Hillcrest paid two years earlier.

 █ Evidence of the price paid for condemned land in a sale prior to the proceeding in which the condemnation is sought, and especially evidence as to the purchase price paid by the condemnee, is admissible generally, at least where the sale is voluntary and is not too remote in point of time. State Highway Comm. v. Ladner, 243 Miss. 176, 181-2, 137 So. 2d 784, 786-7 (1962); State Highway Comm. v. Taylor, 237 Miss. 847, 116 So. 2d 757 (1960). The price paid for the farm by Hillcrest within two years of the condemnation is of considerable probative value on the before and after taking value of

this land, and damages. If appellees purchased it at an unusual bargain or low price, below market value, or if other circumstances affected what they paid for it, that could have been shown, but was not. If appellees made substantial, expensive improvements in the two-year interim, that could be shown, but was not. The evidence indicates an increase of an indeterminate amount in market value of property in this vicinity as a result of installation of the NASA facility beginning in October 1961. Yet considering all of these factors, it is incredible on this record that the property would have increased in value within two years from what was paid for it, $128,600, to anything near the valuations placed upon it by Dr. Stanfield or appellees' other witnesses, $316,000 and up.

Appellant's witnesses placed the damages to the property in the range of $11,850 to $22,300. There is a tremendous gap between the damages estimated by these witnesses and by those for appellees, who placed them within a range of $103,692 to $125,880. Appellees' witnesses figured damages at six to seven times the estimates of witnesses for appellant. In McDuffie v. State Highway Comm., 239 Miss. 518, 522, 124 So. 2d 284, 285 (1960), where the condemnee's valuations before taking were two and a half times those of the commission's witnesses, the Court said: ''Such disparity in value could only have bias and prejudice for the jury in their duty of reaching a fair valuation. The disparity is shocking to the enlightened conscience.''

Three and fifty-seven hundredths percent of the land is actually taken, plus two tenant houses, timber and pasture land. Yet the witnesses for appellees assessed the damages, for the taking of the land and to that remaining, at 31.35% to 35.559% of their before taking values. The land contained no physical improvements, other than improved pastureland, two tenant houses, and timber. The 305 acres on the east side, accessible

indirectly by a county road, contains no improvements other than pasture. Dr. Stanfield claimed damages of $117,950. Two of his witnesses, Davis and Tate, asserted the damages were in excess of that figure.

As in State Highway Commission v. Pepper, 250 Miss. 347, 164 So. 2d 911, 926 (Miss. 1964), these observations are pertinent in the instant case:

> It is astonishing to note the vast gulfs of difference between the respective appraisals of appellant's and appellee's witnesses. It is incomprehensible that reasonable men, who are unbiased and qualified to make impartial appraisals can objectively be as far apart in their deliberate conclusions as is reflected in this schedule. There is a strange uniformity of irreconcilable disparity in values evidenced by the estimates made by these two groups of appraisers. The great difference between the values and damages estimated by the appellee and his witnesses alone is persuasive that the testimony relating to the appraisals is lacking in probative value to justify the verdict . . . .

Moreover, appellees' witnesses did not submit any sales of reasonably comparable property in the vicinity in support of their extremely high valuations. The fact that they had none indicates that their appraisals were not supported by the facts as to market value. State Highway Comm. v. Roche, 249 Miss. 792, 163 So. 2d 874; State Highway Comm. v. Davis, 249 Miss. 643, 163 So. 2d 729.

That which was said in State Highway Commission v. Valentine, 239 Miss. 890, 895-6, 124 So. 2d 690, 693 (1960), is applicable here:

> It is the duty of this Court to determine whether there is any reasonable, believable evidence which will support the verdict in this case. A proper exercise of the judicial function does not require us to believe the incredible. Appellees' witnesses are competent to testify, but because of the extreme, unreasonable, and

unsupported valuations which they placed on the land, as analyzed above, their testimony has little probative value.

See also State Highway Comm. v. Taylor, 237 Miss. 847, 850-1, 116 So. 2d 757, 759 (1960).

In summary, we think the award of $75,000 damages for this taking is so grossly excessive as to evince bias, passion and prejudice by the jury. We find no other reversible errors in the record, but in view of this controlling determination, the judgment of the circuit court is reversed, and the case is remanded for a new trial on damages, unless within ten days from the date the judgment of this Court becomes final appellees accept a remittitur of $25,000, thus reducing the award to the aggregate sum of $50,000. In the event appellees accept such remittitur, the judgment will be affirmed as modified. Otherwise, this case is reversed and remanded.

Reversed and remanded, unless appellees accept specified remittitur, and in that event affirmed with remittitur.

*Lee, C. J., and Rodgers, Patterson and Inzer, JJ.,* concur.